**In the United States District Court
for the District of Kansas**

———————

Case No. 26-cv-1068-TC-GEB

———————

ALAN WAGNER,

*Plaintiff*

v.

BOARD OF EDUCATION
USD 227 HODGEMAN COUNTY, KANSAS, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Plaintiff Alan Wagner sued the USD 227 Board of Education and board members of the Hodgeman County, Kansas, school district for First Amendment retaliation. Doc. 5. He requests a preliminary injunction. Doc. 3. For the following reasons, that motion is granted.

**I**

**A**

Federal Rule of Civil Procedure 65 permits a district court to enter a preliminary injunction pending resolution of a trial on the merits. It is an extraordinary remedy that should only be granted where the "right to relief is clear and unequivocal." *Nat'l Ass'n for Gun Rights v. Polis*, 173 F.4th 1317, 1331 (10th Cir. 2026) (quotation marks omitted). Under Rule 65, the party seeking a preliminary injunction must show four things: a likelihood of success on the merits, a likely threat of irreparable harm, that the harm alleged by the movant outweighs any harm to the non-movant, and that an injunction is in the public interest. *Id.*

Injunctions "that disrupt the status quo are disfavored and must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562

1

F.3d 1067, 1070–71 (10th Cir. 2009) (quotation marks omitted). This heightened standard requires the plaintiff to make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004).

Where, as here, a plaintiff brings a First Amendment claim, likelihood of success on the merits is practically dispositive. "In the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013)). If a violation has occurred, irreparable harm is presumed. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). That harm outweighs any harm to the defendants. *See Ortega v. Grisham*, 148 F.4th 1134, 1154 n.13 (10th Cir. 2025) (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 806 (10th Cir. 2019)) ("[W]hen a constitutional right hangs in the balance . . . 'even a temporary loss' usually trumps any harm to the defendant."). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

**B**

Plaintiff Alan Wagner lives in Hodgeman County with his wife, Jazmin Wagner, and their ten children.[1] He works as a member of the Kansas Highway Patrol.

The Wagners are involved in their community. Five of their children and their nephew attend the USD 227 elementary school. Mrs. Wagner coaches the fifth grade girls basketball team and, in November 2025, was elected to a seat on the Board. The dispute that gives rise to this lawsuit revolves around Mr. Wagner's comments at a Board meeting that occurred on December 1, 2025, after Mrs. Wagner's election victory but before her term began. The following gives context to that meeting and the larger issues leading up to and surrounding the topics of discussion.

---

[1] The facts are found based on Mr. Wagner's Amended Complaint and the witnesses' testimony at the preliminary injunction hearing held on June 15, 2026.

At some point in October 2025, the Wagners became concerned with how the school handled an incident involving their daughter's fifth grade teacher. The teacher had been arrested for domestic violence. The school told the kids about the arrest and said that the teacher was innocent, but it did not notify the parents. The Wagners learned of the issue and met with the school's superintendent to discuss their concerns and ask why they had not been notified. After the meeting, the superintendent emailed the parents whose children were in the teacher's class. A few days later, the superintendent emailed again explaining that the teacher was back in school after police had dropped the charges.

The Wagners—for the first time ever—attended a Board meeting in early November. Mr. Wagner spoke at the meeting to voice his concerns about the situation with the teacher and to critique the Board's handling of the situation. And, as noted below, he made mental notes about the layout of the room in which the Board meets.

After the November meeting, another incident occurred with the teacher. The teacher became angry with a student in her class who happened to sit next to the Wagner's daughter. The teacher yelled at the student, spat on his face, and slammed his hands on the desk.[2] The student's parents filed a police report. Later that day, local law enforcement officers arrived at the Wagners' to speak to their daughter about the incident. She recalled what she saw, which matched what the student had reported to police. After the incident, the school temporarily removed the teacher from her post.

At some point before December 1, the Wagners evidently also pursued or raised questions about active-shooter training in and around the community. The pleadings and testimony did not illuminate the details of these efforts, but the point is that both Wagners advocated in their community for public safety in the school system against the threat that active shooters may present to the students, educators, and all connected with the local educational system. In particular, the Wagners evidently encouraged local law enforcement officers to attend the upcoming December 1 Board meeting to amplify the concerns about

---

[2] The record is not clear as to whether the teacher physically slammed the student's hands on the student's desk or whether the teacher slammed her hands on the student's desk. That uncertainty is not germane as the record establishes the encounter was sufficiently concerning that law enforcement was called about the situation.

both the Board's handling of the incidents involving their daughter's teacher and threats posed by active shooters.[3]

The Wagners then attended a Board meeting on December 1, 2025, and were given five minutes to speak. Mrs. Wagner, who had been elected to the Board but her term had not yet begun, spoke for three minutes and Mr. Wagner for two. He reiterated his critical concerns regarding the teacher's conduct. In addition, Mr. Wagner shared his concerns about the safety of the Board room where the meeting was being held—which his wife would soon occupy—by noting that many of the Board members were sitting with their backs turned to the room's only (and unsecured) entrance. He noted that these Board members were unsafe because a disgruntled parent could walk in the room and physically attack them. He further stated that a disgruntled parent could use an assault rifle and shoot at Board members through the windows.

There is a factual dispute about what, if anything, Mr. Wagner said next. The Wagners both credibly testified that he finished speaking and simply left, walking out holding hands with his wife. Several members of the Board now contend—after Mr. Wagner filed suit—that at the end of his remarks he said: "I am a disgruntled parent."

A week after the meeting, the Wagners were both at the school in the evening while Mrs. Wagner coached basketball and Mr. Wagner transported several of their children to and from the school. They noticed Board members arriving at the school dressed in attire that indicated there was a Board meeting. Mrs. Wagner became concerned because she, a soon-to-be Board member, had not been notified of any meeting yet was entitled to notice as a member-elect. A Board member's child then approached Mrs. Wagner and asked her why she was not attending the Board meeting.

The next day, law enforcement served Mr. Wagner with a no-trespass letter from the school. *See* Doc. 5-5. The letter noted that Mr. Wagner was banned from all school property for one year because of

---

[3] Mr. Wagner's concern was exacerbated given how the school had handled active shooter trainings in the past. The school had held an active shooter training that did not involve Mr. Wagner. Both he and Mrs. Wagner—but evidently no one else in the community, including local law enforcement and/or the Board—felt that he should have been involved given his law enforcement experience and the fact that he lived close to the school.

4

his unspecified behavior at the December 1 meeting. Law enforcement explained that the Board had voted on the letter at a meeting the previous day. The letter contained no appeal process. Mr. Wagner received no notice that the Board had met to discuss banning him from the school.

Based on these facts, Mr. Wagner filed suit in federal court. Doc. 5. Relevant here, he requests a preliminary injunction ordering the Board to rescind the no-trespass letter. Specifically, Mr. Wagner argues that the Board retaliated against him in violation of the First Amendment. The Board admits it took action motivated by Mr. Wagner's speech, but argues that Mr. Wagner's speech was not constitutionally protected because it was a true threat. A hearing was held on June 15, 2026.

## II

Mr. Wagner has shown that he is substantially likely to succeed on the merits. The other preliminary injunction factors are also in his favor. Accordingly, his motion is granted.

## A

Mr. Wagner brings a First Amendment retaliation claim.[4] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. It is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35 (10th Cir. 2013). The Amendment prevents governmental entities from retaliating against an individual for engaging in protected speech. *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 174 F.4th 1235, 1246 (10th Cir. 2026).

To sustain a claim for First Amendment retaliation, the plaintiff must establish three elements: The plaintiff was engaged in constitutionally protected activity, the defendants caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and the defendants' actions were

---

[4] Although Mr. Wagner's Amended Complaint brings claims for violations of the First Amendment and procedural due process, Doc. 5 at 22, 27, his motion for a preliminary injunction makes no mention of those counts. *See generally* Doc. 4. Thus, only his claim of First Amendment retaliation is considered.

motivated by the plaintiff's protected activity. *Smith*, 174 F.4th at 1246. "Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001).

Only the first element is at issue here. The Board issued the no-trespass order "[b]ecause of" Mr. Wagner's comments at the December 1, 2025, meeting. Doc. 5-5. And the order threatened Mr. Wagner with arrest and civil litigation. The Board does not dispute that "[b]anning a parent from school grounds and all school activities after the parent [complained about the school] would chill an ordinary person from continuing to complain to school officials." *Czaplinski v. Ballard*, No. 25-2057, 2025 WL 2986832, at *4 (D. Kan. Oct. 23, 2025) (collecting cases and noting that the threat of litigation along with a ban would chill an ordinary person).

The Board focuses its argument on the discrete issue of whether Mr. Wagner's speech was constitutionally protected. It makes no argument on the other two elements.

**B**

The undisputed evidence establishes that Mr. Wagner engaged in what the Tenth Circuit has described as pure speech. *See Smith*, 174 F.4th at 1249 n.5 ("Pure speech is words or conduct limited in form to what is necessary to convey an idea. Because pure speech implicates core First Amendment considerations, it is rigorously protected regardless of meaning.") (brackets, citations, and quotation marks omitted); *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) ("All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections.") (brackets and quotation marks omitted). He appeared at the public school board meeting where his children attend and his wife was recently elected to serve as a member of the Board. And he spoke about the school's operations and his safety concerns, including the Board room's layout. This is the type of speech that the Supreme Court "has frequently reaffirmed . . . occupies the highest rung of the heirarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quotation marks omitted).

The Board concedes that most of Mr. Wagner's statements were conduct that the First Amendment protects. In other words, there is

no meaningful dispute that Mr. Wagner is substantially likely to succeed on the merits, which entitles him to the extraordinary relief he seeks. *See Verlo,* 820 F.3d at 1126.

The Board's sole argument to the contrary is that Mr. Wagner made a statement at the end of his speech that its members—who were the subject of Mr. Wagner's criticism—construed to be a true threat. A true threat is a historically unprotected communication. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)). It is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *United States v. Dillard*, 795 F.3d 1191, 1199 (10th Cir. 2015) (quoting *Black*, 538 U.S. at 359). "To fall outside of the First Amendment's protections, a threat must 'according to its language and context convey a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic, unpleasantly sharp attacks on government and public officials.'" *Id.* (quoting *United States v. Crews,* 781 F.2d 826, 832 (10th Cir.1986)). Although the speaker need not subjectively intend to act upon the threat, the threat must nonetheless "include 'a serious expression of an intent to commit an act of unlawful violence.'" *Id.* (quoting *Black*, 538 U.S. at 359).

The Board's argument fails for two reasons. *First*, it bears the burden of establishing that Mr. Wagner's otherwise protected political discourse became unprotected because it was a true threat.[5] *See Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003) ("The Court has long cautioned that, to avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit is unprotected."); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the

---

[5] The Board argues in supplemental briefing that it is Mr. Wagner's burden to show he did not make a true threat. Doc. 23 at 1–3. Not so. Mr. Wagner must show that he is substantially likely to succeed on the merits of his First Amendment claim, and he has done so by showing that he engaged in pure speech. The Board, as the governmental entity that seeks to restrict Mr. Wagner's speech, "bears the burden of proving the constitutionality of its actions." *Playboy*, 529 U.S. at 816; *accord Madigan*, 538 U.S. at 620; *Philadelphia Newspapers*, 475 U.S. at 777. Not only has the Board failed to offer legal support for its position, but its position is counterintuitive to the concept of free speech: The Board's rule would authorize government officials to proactively restrict speech under the guise of a "true threat" any time they disagree with a message and force the speaker to file suit to prove there was no true threat.

Government bears the burden of proving the constitutionality of its actions."); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified."). And it has not done so based on the evidence presented. Even viewed in the light most favorable to the Board, the evidence is in equipoise. While there was testimony that a jury might credit to the effect that Mr. Wagner said he was a disgruntled parent, there was also credible testimony that he did not make that statement at all. Indeed, the first time the Wagners learned of the Board's contention that he uttered a true threat was when the Board filed its opposition to his request for a preliminary injunction. This state of affairs leads to the conclusion that the Board has failed to establish that Mr. Wagner made the statement the Board now contends was a true threat. *See United States v. Hanson*, 534 F.3d 1315, 1318 (10th Cir. 2008) ("Evidence which does not preponderate or is in equipoise simply fails to meet the required burden of proof.").

*Second*, even assuming Mr. Wagner said on December 1 that he was a disgruntled parent, that is not a true threat. That is because the Board's evidence fails to establish that the statement contained "a serious expression of an *intent to commit* an act of unlawful violence." *Dillard*, 795 F.3d at 1199 (emphasis added). As the Board concedes, Mr. Wagner illustrated his concerns by "describ[ing] what a 'disgruntled parent' could do to the School Board . . . ." Doc. 14 at 5. But he never expressed a serious intent to commit violence. Even if he had been more direct and stated that *he could* commit violence against the Board, the statement's context—Wagner's law enforcement experience, his wife's future Board position, and their advocacy for safety within and beyond the classroom, including active shooters in the community—merely highlighted the danger posed to the Board given the ease with which a disgruntled parent could access the Board. *See Dillard*, 795 F.3d at 1201 (quoting *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002)) ("In determining whether a communication conveys a true threat, 'context is critical [ ] and history can give meaning to the message.'").

This conclusion is further underscored by the Board's reaction to the alleged true threat. As the Tenth Circuit has noted, "the 'reaction of the recipient of the alleged threat' is relevant in determining whether a reasonable person would interpret a statement to be a threat." *United*

8

*States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (quoting *United States v. Magleby*, 241 F.3d 1306, 1311 (10th Cir. 2001)). Neither the Board nor other participants in the meeting exhibited any negative reaction to or concern regarding Mr. Wagner's comments. And when the Board was meeting a week later to consider the no-trespass order against Mr. Wagner, both he and his wife were present at the school without any apparent concern from the Board members who allegedly heard his statement. Indeed, the evidence suggests that the Board called their attorney after the December 1 meeting instead of law enforcement. Although there was evidence that some Board members made notes of the encounter at some point after the meeting—some allegedly later that night and others a day or more later—describing Mr. Wagner as disgruntled, none of the Board members (nor anyone else present) expressed any contemporaneous concern as to Mr. Wagner's comments or took actions suggesting that they perceived Mr. Wagner's comments as threatening. As a result, the evidence suggests that Mr. Wagner's exclusion from the school grounds for one year was attributable to the political discourse and not a true threat.

\* \* \*

The evidence confirms that Mr. Wagner is substantially likely to succeed on the merits of his First Amendment claim and the Board's efforts to restrict his appearance as evidenced by the no-trespass letter are unconstitutional. The Board's efforts to justify its conduct by invoking the true threat doctrine also fail on the facts and the law.

## C

That Mr. Wagner has shown a likelihood of success on the merits means that he is entitled to a preliminary injunction. His First Amendment injury is presumed to be irreparable. *See Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19. And that injury outweighs any harm to the Board. *See Ortega*, 148 F.4th at 1154 n.13. Finally, it is in the public interest to restore Mr. Wagner his First Amendment rights, not to mention his right to access the school to help care for his children. *See id.*

Granting Mr. Wagner an injunction would restore the status quo ante. Injunctions that disrupt the status quo are disfavored, and "[a]n injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute developed." *Beltronics*, 562 F.3d at 1070–71 (quotation marks omitted). Conversely, "[t]raditional equity practice held that the *sole* purpose of a

preliminary injunction was to preserve the status quo during the pendency of litigation." *O Centro*, 389 F.3d at 1012 (emphasis in original).

The last peaceable status between the parties was before the Board issued the no-trespass letter on December 8, when Mr. Wagner could access the school like any other parent. An injunction preventing the Board from enforcing that restriction would restore the parties to that status. *See id.* at 1013 ("[C]ourts of equity have long issued preliminary injunctions requiring parties to *restore* the status quo ante.") (emphasis in original). As a result, Mr. Wagner's injunction is granted to the extent that the Board is precluded from enforcing the no-trespass letter.

## III

For the foregoing reasons, Mr. Wagner's motion for a preliminary injunction, Doc. 3, is GRANTED. Defendants are ORDERED not to enforce the no-trespass letter.

It is so ordered.


Date: June 18, 2026                    s/ Toby Crouse
                                       Toby Crouse
                                       United States District Judge